[Nos. E029587, E029770, E029940. Fourth Dist., Div. Two. Dec. 18, 2002.]

Conservatorship of the Person and Estate of JOHN L. McELROY. GARY McELROY, as Conservator, etc., et al., Petitioners and Respondents, v. CAROL KRAVAGNA, Objector and Appellant.

## COUNSEL

Mahaffey & Associates, Douglas L. Mahaffey, Gino P. Pietro and Lana J. Feldman for Objector and Appellant.

Best, Best & Krieger, William R. DeWolfe, Christopher L. Carpenter and Dean J. Silliman for Petitioners and Respondents.

## OPINION

**HOLLENHORST, J.**—Case No. E029587 is the appeal of Carol Kravagna from the judgment entered in this action on March 28, 2001. The judgment, filed March 28, 2001, confirms a settlement allegedly reached in open court on May 10, 1999. The March 28, 2001, judgment also confirmed the alleged settlement by granting a motion for entry of judgment pursuant to the terms of the alleged settlement agreement. The motion was filed on June 29, 2000, and heard on November 7, 2000.

Ms. Kravagna's primary contention on this appeal is that she did not orally stipulate to the settlement's terms in open court, as required by Code of Civil Procedure section 664.6.[1] She also contends that the proposed settlement contemplated a formal written agreement, and none was ever signed.

Consolidated appeal No. E029770 is Ms. Kravagna's appeal from a subsequent order of June 13, 2001, which granted a petition for a substituted judgment for modification of a living trust and related actions. Ms. Kravagna contends the trial court abused its discretion in granting the conservator's petition because it refused to hear her objections on grounds that she had no standing to protest. She argues that this ruling was improper because it was based on the trial court's determination that the settlement agreement was valid and her only rights were to enforce it.

Consolidated appeal No. E029940 is Ms. Kravagna's appeal from a trial court order of July 19, 2001. She contends the trial court failed to comply with the provisions of Probate Code section 1310, subdivision (b), and erroneously decided she had no standing to protest, again because of the trial court's ruling that the settlement agreement was binding.

### FACTS AND PROCEDURAL HISTORY

On January 13, 1999, Gary McElroy filed a petition seeking appointment of a probate conservator of the person for his father, John L. McElroy. The

---

[1] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

petition alleged that John McElroy was unable to provide for his personal needs. Specifically, the petition alleged that he "was 5150'd for the second time in a year. He is not able to make decisions regarding his care, treatment or placement. He requires placement per his current doctors outside his residence. He is confused, sometimes combative and wanders." The petition sought additional special orders regarding dementia. The petition requested that Gary McElroy and his sister, Colleen McElroy-Coombs, be appointed conservators of the person of John McElroy. On February 1, 1999, the petition was amended to include a request that Gary McElroy be appointed guardian of the estate of his father.

On February 11, 1999, a probate investigator filed a report pursuant to Probate Code section 1826. The investigator reported that John McElroy was a 76-year-old male who was living in the secure unit of an assisted living facility in Corona. He had been diagnosed with psychosis due to dementia and dementia moderate vascular etiology. Mr. McElroy had severely disorganized thinking and hallucinations. He had "major impairment in orientation to time, place, and situation; major impairment in ability to recall, to reason logically, to understand, and to appreciate quantities."

The petition was heard on February 16, 1999. A deputy public defender appeared on behalf of John McElroy and an attorney, Ellen Weinfurtner, appeared for Gary McElroy. Appellant Carol Kravagna appeared without counsel and objected to the petition. Ms. Weinfurtner described her as "Mr. McElroy's companion, who has lived with him for the past 25 years and still resides in their home." A contested hearing was set in April and eventually heard on May 10, 1999.

The dispositive issue in this case arises from the May 10, 1999, hearing. Gary McElroy and Colleen McElroy-Coombs contend that a valid settlement agreement was reached at that hearing. They subsequently made a motion pursuant to section 664.6 to confirm the settlement agreement. The appeal in case No. E029587 is from the granting of that motion. Carol Kravagna contends that section 664.6 requires that the stipulating parties orally agree in open court to the settlement agreement, and she did not do so. She therefore contends the settlement agreement was a nullity.

At the May 10, 1999, hearing, Ms. Kravagna's counsel, Michael Molloy, stated that his client was withdrawing her previous objections to the appointment of a conservator based on certain settlement terms. As discussed below in detail, the court approved the stipulation and settlement of the parties. Gary McElroy and Colleen McElroy-Coombs were appointed conservators of the person of their father, and Gary McElroy was appointed conservator of his father's estate.

On June 14, 2000, an appraisal was filed. It valued John McElroy's property at $2,744,941.

On June 29, 2000, Ms. Weinfurtner and associated counsel filed a motion for entry of judgment pursuant to the terms of the settlement allegedly reached at the May 10, 1999, hearing. Specifically, the motion requested that Ms. Kravagna be ordered to (1) vacate John McElroy's home in Murrieta; (2) turn over all of his personal property to the conservators; (3) sign a settlement agreement; and (4) dismiss a lawsuit she had filed against the conservators. As discussed below, moving parties lodged a videotape of the May 10, 1999, hearing as well as a transcript prepared from the videotape, and declarations.

The motion was heard on October 18, 2000.[2] The conservator's attorney argued that the trial court should consider the overall conduct of the parties in determining whether Ms. Kravagna agreed to the settlement. Ms. Kravagna's attorney argued that the videotape showed that she never orally agreed to the settlement on the record in open court. The trial court then announced that it would view the videotape and read the transcripts before making a decision.

On November 7, 2000, the trial court granted the motion. In a lengthy opinion, it said: "On the basis of the testimony of the interested witnesses about what occurred in the courtroom, the court would find that the conservators have sustained their burden, if only by the barest preponderance. In addition, however, Ms. Kravagna's conduct during and following the hearing is more consistent with her having given her assent. After being asked by her attorney whether the terms were 'her understanding,' she failed to correct the statement of Judge Schulte that 'they [apparently referring to all of the parties] nodded their assent.'" This is the decision challenged in E029587.

After several hearings on extensive objections to a proposed order and proposed judgment, and other matters, the court approved a judgment which carried out the terms of the oral settlement agreement of May 10, 1999.

The order for entry of judgment was filed on February 16, 2001. It approved and enforced the oral settlement agreement of May 10, 1999. The order provides that "Carol Kravagna shall hereafter have no further right or interest in or to John McElroy's estate, trust, conservatorship estate or corporation, except Carol Kravagna shall retain the right to enforce this judgment." It also orders the dismissal of two other superior court actions

---

[2]Judge Cunnison heard the motion. Judge Schulte presided at the May 10, 1999, hearing.

Ms. Kravagna had filed against the conservators. Judgment was entered accordingly on March 28, 2001. This appeal, case No. E029587, followed.

On March 2, 2001, Gary McElroy, as conservator of the estate of his father, filed a petition for substituted judgment to modify a revocable living trust, to create a revocable living trust, and to transfer property to the trusts. The petition alleged that, because of the settlement with Carol Kravagna, it was desirable, for tax reasons, to transfer $550,000 to the existing 1997 revocable trust to fund the settlement, and to establish a new revocable trust for the balance of the conservatorship assets. The petition also alleged that the assets on hand were worth slightly more than $7 million.

Ms. Kravagna responded by filing opposition to the motion. She also filed a motion for a stay pursuant to section 918 while the appeal from the earlier judgment was pending. She argued that she had rights to the conservatorship estate as a result of her *Marvin* action,[3] and that she also had rights as a result of her wrongful termination from her positions with John McElroy's corporation.

The motion for a substituted judgment and related matters were heard on March 26, 2001, and taken under submission. The motion for a substituted judgment was granted on June 13, 2001. Responding to the conservators' argument that Ms. Kravagna lacked standing to oppose the motion because of the alleged settlement, the court concluded "that no substantial interest of Ms. Kravagna would be affected by the court's order on the petition for substituted judgment, and . . . she has no standing to oppose it." This appeal, case No. E029770, followed.

Gary McElroy, as conservator of his father's estate, then filed a motion for an order directing him to proceed with the funding of the two trusts, notwithstanding the appeal of the trial court's granting of the motion for substituted judgment. A hearing was held on this issue on July 19, 2001. The conservator argued that the motion was proper under Probate Code section 1310, subdivision (b), and that Ms. Kravagna lacked standing to oppose the motion. The trial court granted the motion. It pointed out that it had found, in the June 13, 2001, order, that she lacked standing to oppose the court's order on the petition for substituted judgment, and it concluded that she had no standing with respect to the issue raised in the motion. This appeal, case No. E029440, followed.

---

[3]One of the superior court actions filed by Ms. Kravagna was based on *Marvin v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106]. (*Kravagna v. McElroy* (Super. Ct. Riverside County, 2000, No. RIC338763).) There was an issue as to whether the action was barred by the alleged May 10, 1999, settlement.

## ISSUES

Ms. Kravagna argues that the March 28, 2001, judgment must be reversed because she did not personally and orally agree to the settlement in open court, as required by section 664.6 (E029587).

Secondly, she argues the trial court abused its discretion in granting the motion for substituted judgment without an evidentiary hearing (E029770).

Thirdly, she argues the trial court abused its discretion in granting relief from the automatic stay under Probate Code section 1310, subdivision (b), because the conservator failed to make the requisite showing of imminent injury or loss to justify an order and because the trial court again erroneously held that she lacked standing.

## STANDARD OF REVIEW

■ The parties agree that the trial court's determination of whether the parties entered into a binding settlement agreement in open court is reviewed under a substantial evidence standard of review. Our Supreme Court has stated: "Past cases have established that, in ruling upon a section 664.6 motion for entry of judgment enforcing a settlement agreement, and in determining whether the parties entered into a binding settlement of all or part of a case, a trial court should consider whether (1) the material terms of the settlement were explicitly defined, (2) the supervising judicial officer questioned the parties regarding their understanding of those terms, and (3) the parties expressly acknowledged their understanding of and agreement to be bound by those terms. In making the foregoing determination, the trial court may consider declarations of the parties and their counsel, any transcript of the stipulation orally presented and recorded by a certified reporter, and any additional oral testimony. [Citations.] The standard governing review of such determinations by a trial court is whether the court's ruling is supported by substantial evidence. [Citations.]" (*In re Marriage of Assemi* (1994) 7 Cal.4th 896, 911 [30 Cal.Rptr.2d 265, 872 P.2d 1190].)

The parties also agree that the determination of whether the statutory requirements were met is a question of law which we review independently: "We make such a [substantial evidence] determination, however, only after deciding whether the parties meet the statutory conditions of section 664.6. Construction and application of a statute involve questions of law, which require independent review. [Citation.]" (*Murphy v. Padilla* (1996) 42 Cal.App.4th 707, 711 [49 Cal.Rptr.2d 722]; see also *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 815 [71 Cal.Rptr.2d 265].)

However, neither party focuses on a unique aspect of this case. The trial judge, Judge Cunnison, based his decision on his viewing of a videotape of the May 10, 1999, proceedings before Judge Schulte, together with a transcript which was subsequently prepared from the videotape. Videotape was used to record the proceedings pursuant to former section 270. Former section 270 provided for a demonstration project "to assess the costs, benefits, and acceptability of utilizing audio and video recording as a means of producing a verbatim record of proceedings" in certain selected counties. (Stats. 1986, ch. 373, § 1, p. 1552, as amended by Stats. 1989, ch. 678, § 1, p. 2240 and repealed by Stats. 2001, ch. 115, § 2.) Thus, in courtrooms selected for the demonstration project, video recording "may be used in lieu of the verbatim record prepared by a court reporter . . . ." (Stats. 1989 § 678, § 1, p. 2240.)

Former section 270, subdivision (d) provided: "An audio or video recording or transcript produced therefrom when certified as being an accurate recording, video taping, or transcript of the testimony and proceedings in a case, is prima facie evidence of that testimony and those proceedings." (Stats. 1989, ch. 678, § 1, p. 2240.)

The former statute also provided for its implementation by Judicial Council and local rules. (Stats. 1986, ch. 373, § 1, p. 1552.) Thus, California Rules of Court, rule 980.5(g), as amended in 1993, provides that a videotape "shall satisfy any requirement in these rules or in any statute for a reporter's transcript of oral proceedings." Superior Court of Riverside County, Local Rules, rule 1.0073, adopted in 1993 and amended in 1997, provides that the videotape is the official record of the proceedings.

Since Judge Cunnison reached his conclusions by viewing the videotape of the hearing before Judge Schulte, it could be argued that we should do the same, i.e., that we are in as good a position as Judge Cunnison to view the videotape to determine what happened at the May 10, 1999, hearing, and that we need not give any deference to Judge Cunnison's findings. ▌ The usual rule is that "[w]here a factual determination is based on live witness testimony or review of physical evidence, there is every reason to believe a trial court's resolution will be more accurate than that of an appellate court which received no firsthand exposure to the evidence. Thus, the substantial evidence standard of review appropriately accords considerable deference to a trial court's factual findings." (*Hurtado v. Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1024 [213 Cal.Rptr. 712], disapproved on other grounds in *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479, fn. 4 [243 Cal.Rptr. 902, 749 P.2d 339].) But because Judge Cunnison did not preside at the May 10, 1999, hearing, and because of our equal opportunity to view the videotape, it can be argued that the usual rule is inapplicable.

Such an argument was raised in *Moustakas v. Dashevsky* (1994) 25 Cal.App.4th 752, 754 [30 Cal.Rptr.2d 753]. The court rejected it: "It was probably inevitable that those responsible for the practical aspects of judicial administration would decide to use video cameras to make a record of trial proceedings. Though this technology lacks the advantages of computerized court reporting, the visible and audible information thus recorded might be of value to many people, including judges. California Rules of Court, rule 980.5(i) provides that a videotape may be made part of the record on appeal upon stipulation of the parties and approval by the appellate court. [¶] The rules of court do not address the most important implication of the video-taping of trial proceedings. Many aspects of the time-honored rules limiting the scope of appellate review are based on the trial judge's opportunity to see and hear witnesses, attorneys, and jurors. A drastic change in the principles of appellate review would be needed before we could base our decisions on appeal on our own evaluation of the sights and sounds of the trial courtroom. Because of the far-reaching implications, any such change must come from the Legislature or from higher judicial authority. Accordingly, we do not regard the videotape as part of the record on this appeal." (*Moustakas,* at pp. 754-755.)

This court also respects the substantial evidence standard of review and we apply the substantial evidence standard to the trial court's factual determinations, as discussed below. We have therefore reviewed all of the evidence before the trial court, including the videotape and the transcript of the videotape in our record,[4] to determine whether there is substantial evidence to support the trial court's decision.[5]

THE MAY 10, 1999, HEARING

The May 10, 1999, hearing was set as a contested hearing on the petition for appointment of conservators of the person and estate of John McElroy. The hearing opens with Judge Schulte's question as to whether the matter had been resolved. The conservator's attorney, Ms. Weinfurtner, responded that it had been resolved. She then stated the requests being made. Ms. Kravagna's attorney, Mr. Molloy, said: "Carol Kravagna, at the prior court hearing in this matter, made oral objections without counsel. Today she is

---

[4]Our record also contains a transcript of the hearing which was prepared from the videotape by a firm representing the conservators. We have not considered this unofficial transcript for any purpose.

[5]Although there are no discrepancies between the videotape and the transcript, respondent urges that the reporter omitted several phrases from the transcript. We need not consider these alleged omissions as they do not affect our analysis. For convenience sake, therefore, we will cite to the reporter's transcript of the proceedings as prima facie evidence with occasional references to the videotape and other evidence.

present in court and withdrawing those objections based on the following terms of agreement . . . ." After he stated the terms, Judge Schulte asked if that was the agreement. Mr. Molloy stated one further term and the following crucial colloquy occurred: "[Ms. Weinfurtner]: Is that your understanding, Mr. McElroy? Ms. Kuntz [*sic*: should be Coombs]? [¶] Yes. That's our agreement your Honor. [*Mr. Molloy*]: *Is that your understanding?* [¶] [The Court]: The record will show that they nodded their assent. [¶] [Mr. Molloy]: If I could ask for one second. Excuse me, your Honor. [¶] [Ms. Thompson[6]]: And, your Honor, I have no objection to the agreement and the settlement. [¶] [The Court]: Very well. The stipulation and agreement of the parties is approved. Counsel as designated shall prepare the stipulation and submit it for signature and ratification."

The parties agree, and our viewing of the videotape confirms, that the transcript omits the italicized statement of Mr. Molloy. The next statement of the court therefore becomes ambiguous, as it is not clear whether the court was referring to the nods of Gary McElroy and Coleen McElroy-Coombs or to the nods of all three. Gary McElroy and Loa Wilson, who is John McElroy's sister, submitted declarations stating that they saw Ms. Kravagna nod her head. Both declarations state: "I then observed Mr. Molloy turn to Carol Kravagna, who was seated in the first row behind counsel table, and audibly ask her if she agreed to the settlement. I clearly observed her nod her head in the affirmative."[7]

Judge Schulte therefore specifically found that the parties agreed to the settlement terms as stated by Mr. Molloy.

## THE TRIAL COURT'S DECISION

As discussed above, our review is limited to the question of whether there is substantial evidence to support Judge Cunnison's decision on the motion to enforce the alleged settlement. Judge Cunnison reviewed the videotape, the transcript, and the declarations. On the crucial issue, he said: "In a section 664.6 hearing, the court must first determine whether the requirement of the personal assent of the parties has been met. The court finds that the conservators have sustained their burden on that issue. In the video recording, Ms. Kravagna's oral response, if any, to the court's question, 'Is that the agreement?' is inaudible. It is difficult, because of the tape quality, to determine whether she nodded her assent, although some movement of the

---

[6]Ms. Thompson is a deputy public defender who was appearing on behalf of the conservatee.

[7]We note that our own repeated viewing of the videotape does show a nod of the head, but it appears to be a negative nod followed by Ms. Kravagna's urgent consultation with her counsel. But, as noted above, our review is a substantial evidence review.

head is momentarily observable. [¶] The conservators rely upon the declarations of Gary McElroy and Loa Wilson that Ms. Kravagna nodded in agreement, and the testimony of attorney Weinfurtner that she heard Ms. Kravagna answer 'Yes.' Ms. Kravagna relies upon her own declaration as follows: [¶] ['I absolutely never consented to the purported settlement in this matter. I never spoke a single word in consent to the reading on the record . . . . I could not even hear what was being said because the court room acoustics were very bad, there were a lot of loud noises and the microphone levels were low.'] [¶] Ms. Kravagna's claim not to have heard is subject to doubt. The tape shows that she was seated in the front row of the courtroom, only a few feet from where her attorney, Mr. Molloy, and the conservators' attorney, Ms. Weinfurtner, were standing as they recited the terms of the settlement agreement. The videotape shows that each recited the terms audibly and clearly. [¶] On the basis of the testimony of the interested witnesses about what occurred in the courtroom, the court would find that the conservators have sustained their burden, if only by the barest preponderance."

We agree with the conservators that substantial evidence supports this decision.[8] We therefore agree with Judge Schulte and Judge Cunnison that assent was expressed by the parties nodding their heads in response to the question of whether they agreed to the settlement. We therefore turn to the issue of whether a nod of the head satisfies the statutory requirement. As noted above, an independent standard of review applies to that issue.

### SECTION 664.6

Section 664.6 provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

 Ms. Kravagna's primary contention is that she did not personally and orally stipulate to the settlement as stated by her attorney and, even if she did nod her head, that was not a sufficient indication of consent to satisfy the statutory requirement that the consent be made orally before the court.

Section 664.6 created "a summary, expedited procedure to enforce settlement agreements when certain requirements that decrease the likelihood of

---

[8]However, although the trial court may have considered whether the parties understood the terms of the settlement and whether the parties expressly agreed to be bound by the terms of the settlement (*In re Marriage of Assemi, supra*, 7 Cal.4th 896, 911), it did not make any other findings on these issues. It did consider and find that the terms of the settlement were sufficiently definite and certain to be enforced.

misunderstandings are met." (*Levy v. Superior Court* (1995) 10 Cal.4th 578, 585 [41 Cal.Rptr.2d 878, 896 P.2d 171].) In *Levy* our Supreme Court discussed the issue of whether a settlement agreement had to be personally signed by the litigant. It held that section 664.6 requires the signature of the litigant. (*Levy,* at p. 580.) Looking first to the words of the statute, the court found that the statutory language was not dispositive because the word "party" could have more than one reasonable interpretation. (*Id.* at pp. 582-583.) Considering the legislative intent, the court found that "settlement is such a serious step that it requires the client's knowledge and express consent. [Citation.]" (*Id.* at p. 583.) The legislative intent and surrounding circumstances established that settlement had to be made by the litigants personally. (*Id.* at pp. 584-585.)

Relevant here, our Supreme Court explained: "The litigants' direct participation tends to ensure that the settlement is the result of their mature reflection and deliberate assent. This protects the parties against hasty and improvident settlement agreements by impressing upon them the seriousness and finality of the decision to settle, and minimizes the possibility of conflicting interpretations of the settlement. [Citations.] It also protects parties from impairment of their substantial rights without their knowledge and consent. [Citation.]" (*Levy v. Superior Court, supra,* 10 Cal.4th 578, 585, fn. omitted.)

The Supreme Court cited its earlier decision in *In re Marriage of Assemi, supra,* 7 Cal.4th 896. In that case, the issue was whether an oral stipulation for settlement was made "before the court" when it was made before a retired judge acting as an arbitrator. The court concluded that the stipulation was made before the court because the "stipulation was presented to him in the context of his role as a final arbiter who was presiding over the proceeding in which such determination would be made." (*Id.* at p. 900.) In other words, the Supreme Court found that the retired judge was acting in "a quasi-judicial capacity as arbiter of the controverted issues . . . ." (*Id.* at p. 909.) The oral settlement was therefore a settlement in a judicially supervised proceeding, and the oral stipulation was therefore made before the court, as required by section 664.6. (*Assemi,* at p. 909.)

In *Assemi,* the retired judge "inquired of the parties individually whether they understood and agreed to the terms as recited on the record, [and] both husband and wife replied affirmatively." (*In re Marriage of Assemi, supra,* 7 Cal.4th 896, 902.) ▪ Relevant here, the court said: "Past cases have established that, in ruling upon a section 664.6 motion for entry of judgment enforcing a settlement agreement, and in determining whether the parties entered into a binding settlement of all or part of a case, a trial court should

consider whether (1) the material terms of the settlement were explicitly defined, (2) the supervising judicial officer questioned the parties regarding their understanding of those terms, and (3) the parties expressly acknowledged their understanding of and agreement to be bound by those terms." (*In re Marriage of Assemi, supra,* 7 Cal.4th 896, 911.)

 Applying these considerations to the present case, it is undisputed that Judge Schulte did not question the parties regarding their understanding of the settlement terms, the parties did not expressly acknowledge their understanding of those terms, and the parties did not orally agree to be bound by those terms. In addition, the terms themselves were qualified by clauses such as "upon execution of the settlement agreement." The terms were thus sufficiently ambiguous to provide some support for Ms. Kravagna's present argument that she did not agree to a settlement and that the parties only had a mutual intention to agree to a written settlement agreement in the future.

In *Johnson v. Department of Corrections* (1995) 38 Cal.App.4th 1700 [45 Cal.Rptr.2d 740], the court found that *Levy* applied to cases involving oral settlement agreements. (*Johnson,* at p. 1703.) Under *Levy,* personal agreement to the oral settlement agreement is required. (*Johnson,* at p. 1703.) Accordingly, *Levy* compelled reversal because plaintiff "never personally voiced his acceptance of the settlement agreement to the court." (*Johnson,* at p. 1706.) The court so found because *Levy* emphasized that the purpose of the oral consent requirement was to decrease the likelihood of misunderstandings, to impress upon the litigants the seriousness and finality of their settlement decision, and to minimize the possibility of conflicting interpretations of the settlement. (*Johnson v. Department of Corrections, supra,* 38 Cal.App.4th 1700, 1708, citing *Levy v. Superior Court, supra,* 10 Cal.4th 578, 585.)[9]

We are therefore constrained to agree with Ms. Kravagna that these legislative goals would not be served by an interpretation that equates a nod of the head with oral consent. No stretch of the judicial imagination can make it so. As demonstrated by this case, head movements are too ambiguous to demonstrate assent and the ambiguity produces the litigation the statute was designed to avoid. Indeed, nods are not normally recorded by the reporter and, if the hearing had been held before a court reporter, the nods

---

[9]In the recent case of *Gauss v. GAF Corporation* (2002) 103 Cal.App.4th 1110 [127 Cal.Rptr.2d 370], the court applied the rule that a written settlement had to be signed by a corporate party in order to be enforceable under section 664.6. It said: "Section 664.6, as construed by the Supreme Court in *Levy,* simply does not permit the use of its summary, expedited procedures to enforce a settlement agreement signed only by a party's agent. [Citations.]" (*Gauss,* at p. 1121.)

would not have been recorded at all. The court would then have had to rely on the declarations of the opposing parties who have a real interest in preserving the settlement.

While our interpretation is consistent with the legislative goals, a consideration of the purpose of the statute is not even necessary because the words are clear. As we stated in *Kirby v. Southern Cal. Edison Co.* (2000) 78 Cal.App.4th 840 [93 Cal.Rptr.2d 223]: ■ "Our primary task in interpreting a statute is to determine the Legislature's intent so as to effectuate the purpose of the law. [Citations.] Because the statutory language is the best indicator of legislative intent, we must begin by examining the words of the statute itself [citation], giving those words their plain meanings [citation]. 'When statutory language is clear and unambiguous, there is no need for construction, and courts should not indulge in it.' [Citation.]" (*Id.* at p. 844.)

■ The words of the statute, "orally before the court," are clear and unambiguous. As in *Levy*, we first consider whether the words used in the statute are susceptible to more than one reasonable interpretation. If so, "we consider a variety of extrinsic aids, including the statutory context and the circumstances of the statute's enactment, in determining legislative intent. [Citations.]" (*Levy v. Superior Court, supra*, 10 Cal.4th 578, 582.) Although the *Levy* court found the phrase "parties" to be reasonably susceptible to more than one interpretation, there is no ambiguity in the word "oral." It means "uttered by the mouth or in words." (Webster's 3d New Internat. Dict. (1993) p. 1585.)

It would be torturing the English language, the statutory language, and the intent of the Legislature to interpret a nod as an oral agreement. Accordingly, Judge Cunnison's interpretation of Ms. Kravagna's nod as the statutorily required oral assent cannot stand. More than an indication of assent is required. Unambiguous assent, expressed orally, is required in order to "minimize[ ] the possibility of conflicting interpretations of the settlement. [Citations.]" (*Levy v. Superior Court, supra*, 10 Cal.4th 578, 585.) A nod simply does not comply with the statutory requirement of oral consent.

The violation is especially egregious here because Judge Schulte did not question any of the parties as to whether they understood the settlement terms and were agreeing to be bound by them. Even the questioning of the conservators by their counsel was inadequate: Ms. Weinfurtner only asked the conservators "Is that your understanding?" Neither counsel nor Judge Schulte inquired whether they agreed to be bound by the settlement, and they did not orally agree to it. Similarly, although the parties agree that Mr. Molloy asked Ms. Kravagna "Is that your understanding?" there was no

oral response by her and no follow-up oral agreement to be bound by the terms of the settlement.

Since nods are insufficient to show oral assent under the statute, Judge Cunnison erred when he upheld the alleged settlement under section 664.6. The error requires reversal of the order granting the motion for enforcement of the alleged settlement.

## THE SUBSTITUTED JUDGMENT

█ The trial court is authorized to substitute its judgment for that of the conservatee under Probate Code section 2580 et seq. As explained in *Conservatorship of Hart* (1991) 228 Cal.App.3d 1244 [279 Cal.Rptr. 249]: "The doctrine underlying the substituted-judgment statute was first recognized in California in *Estate of Christiansen* (1967) 248 Cal.App.2d 398 [56 Cal.Rptr. 505]. . . . *Christiansen* declared 'that the courts of this state, in probate proceedings for the administration of the estates of insane or incompetent persons, have power and authority to determine whether to authorize transfers of the property of the incompetent for the purpose of avoiding unnecessary estate or inheritance taxes or expenses of administration, and to authorize such action where it appears from all the circumstances that the ward, if sane, as a reasonably prudent man, would so plan his estate, there being no substantial evidence of a contrary intent.' (248 Cal.App.2d at p. 424.) Significantly, *Christiansen* did not require that a court find the ward *would have* acted as proposed; instead it adopted an essentially objective prudent-person standard. Thus *Christiansen* contemplated *substitution* of the court's judgment for that of the incompetent person." (*Conservatorship of Hart, supra,* 228 Cal.App.3d 1244, 1251-1252, original italics.)

Accordingly, Probate Code section 2580 provides for an order which authorizes or requires the conservator to take a proposed action for the purpose of (1) benefiting the conservator or the estate; (2) minimizing current or prospective taxes; or (3) providing gifts to persons or charities which would be likely beneficiaries of gifts from the conservatee.

Probate Code section 2582 provides that the court may make an order for substituted judgment only if it determines that the conservatee either is not opposed to the order or, if opposed, lacks legal capacity for the proposed action. It also provides that the court must determine either that the action will have no adverse effect on the estate or that the remaining estate will be adequate for the needs of the conservatee.

Probate Code section 2583 provides that, in deciding a motion for substituted judgment, the court must consider all the relevant circumstances, including 13 circumstances listed in the section.

Probate Code section 2584 states: "After hearing, the court, in its discretion, may approve, modify and approve, or disapprove the proposed action and may authorize or direct the conservator to transfer or dispose of assets or take other action as provided in the court's order."

Ms. Kravagna's appeal on this issue is based on her contention that the trial court abused its discretion in approving the motion for substituted judgment without first holding an evidentiary hearing. In effect, she argues that the word "hearing" as used in Probate Code section 2584 means a full evidentiary hearing. She argues that, without such a hearing, the trial court did not have before it any evidence from which it could determine that the statutory circumstances were present.

The petition for substituted judgment was verified by Gary McElroy. It states, in considerable detail, the actions which were proposed to be taken and the reasons for those actions. It contains a specific discussion of the factors in Probate Code sections 2582 and 2583, and their applicability to the proposed actions. The specific proposal was to fund the 1997 trust with enough money to pay the settlement with Ms. Kravagna and to establish a second trust to hold the remaining conservatorship assets. The tax reasons for doing so are fully explained, and they are reasons which would clearly motivate a reasonably prudent person.

The verified petition therefore contained sufficient facts to allow the trial court to conclude that the statutory requirements were met by the proposal. For example, the statute specifically authorizes actions to minimize current or prospective taxes (Prob. Code, § 2580, subd. (a)(2)), including creating trusts for the benefit of the conservatee and others (Prob. Code, § 2580, subd. (b)(5)), transferring unintentionally omitted property to a trust (Prob. Code, § 2580, subd. (b)(6)) and exercising the conservatee's right to modify an existing trust (Prob. Code, § 2580, subd. (b)(11)).

A hearing was held on the petition, and the parties argued the issue. The public defender appeared at the hearing, representing the conservatee. The public defender stated that their investigation as to whether the conservatee would have wanted the substituted judgment was inclusive and she suggested that an evidentiary hearing might be useful. But the public defender did not oppose the motion for substituted judgment.

Ms. Kravagna contends that an evidentiary hearing was required to establish the factual predicate for the trial court's decision. She relies on *Conservatorship of Hart, supra*, 228 Cal.App.3d 1244. In that case, the court discussed the trial court's discretion under the substituted judgment statutes:

"The superior court's primary function under the substituted-judgment statute will be to make a decision (as the conservatee would if able) on the basis of information furnished to it. The information the superior court receives may or may not be consistent: If there are issues of fact the court of course must determine whether the issues are material to the decision to be made and then resolve any issues it deems material." (*Id.* at p. 1254.) In its instructions on remand, the court said: "We should stress for purposes of remand, however, that adequate regard for the significance of substituted-judgment proceedings and for the rights of all parties including the conservatee requires that the superior court receive and consider relevant and otherwise admissible evidence." (*Id.* at p. 1264.) With regard to the petition, the court said: "As a practical matter an uncontested petition will often be made the basis for a court's order not because it contains competent evidence but simply because it is uncontested; if the petition is contested the petitioner will normally be expected to proceed with evidence sufficient to sustain the applicable burden. In our view a superior court in substituted-judgment proceedings should be reluctant to grant this kind of petition by default. Better practice would be to require proof, by declaration or otherwise, of all relevant circumstances, even if the petition is unopposed." (*Id.* at p. 1266.)

We disagree with Ms. Kravagna's suggestion that an evidentiary hearing is required in all circumstances. Instead, *Hart* teaches that the trial court must gather the information necessary to allow it to make a rational decision in place of the conservatee. In some cases, this will mean that a full hearing is required. In other cases, circumstances such as a need to reduce tax liabilities may make it obvious that action is required. In other words, the trial court must use its discretion in evaluating the information presented to it in order to decide if the information in the petition is sufficient, or if a full contested evidentiary hearing is required.

The trial court here requested counsel for Ms. Kravagna to describe the evidence which would be presented in opposition to the motion. Counsel then responded with a litany of legal issues, such as the effect of an appellate stay, and the alleged invalidity of the 1997 trust. Counsel offered to present testimony to prove that the trust was not validly established and that the conservatee did not have the mental capacity to establish the trust.

In response, conservator's counsel stated that the trusts were revocable, and the trust funds could be returned to the conservator's estate if the 1997 trust was subsequently invalidated. Counsel emphasized that prudent estate administration required the use of the trust to minimize estate taxes and to avoid probate in the event the conservatee died before the case was decided.

The court stated it would take the request for a contested hearing under submission. It subsequently issued a ruling which found that Ms. Kravagna did not have standing to oppose the petition because "no substantial interest of Ms. Kravagna would be affected by the court's order on the petition for substituted judgment . . . ." It noted that "under the most liberal construction of the gift provisions of the proposed trust, only slightly more than one seventh of the assets would be distributed, leaving ample security for any reasonably anticipated debt to her."

At the hearing, the court suggested that it could rely on its prior decision that all of Ms. Kravagna's rights were subsumed by the settlement agreement. While we disagree with the court's suggestion because we have found that the settlement agreement was unenforceable under section 664.6, the court did not rely on this ground in making its decision.

We therefore agree with the conservators that the verified petition made a sufficient showing of the statutory circumstances to justify granting of the petition. The trial court had the discretion to determine if the petition was sufficient, or to decide that it needed further information in order to be in a position analogous to the conservatee or a reasonably prudent person. (*Conservatorship of Hart, supra*, 228 Cal.App.3d 1244, 1253-1254.) It apparently decided that the information before it was sufficient and, having heard the offers of proof, that a full contested evidentiary hearing was unnecessary. We agree with the conservators that the trial court did not abuse its discretion in reaching that conclusion.[10] The order granting the petition for substituted judgment, filed June 13, 2001, is therefore affirmed (case No. E029770).

## THE ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

█ Gary McElroy, as conservator of the estate of his father, filed a petition for an order directing him to carry out the order approving the petition for substituted judgment, notwithstanding the pendency of an appeal. The petition was based on Probate Code section 1310, subdivision (b).

Probate Code section 1310, subdivision (a), provides that, subject to listed exceptions, an appeal stays the operation of an order. Subdivision (b) states the exception: "[F]or the purpose of preventing injury or loss to a person or

---

[10]The court may have been influenced by the clear need to protect the conservatee's estate and beneficiaries from adverse tax consequences which would flow from the conservatee's death before the litigation ended, coupled with the assurances of the conservator's attorney that "[t]his court can always order the second trust, the new trust, to be distributed back to it or she can enforce her judgment against the trust because the trust would be revocable and the conservatee cannot avoid his obligations by putting his assets into a revocable trust."

property, the trial court may direct the exercise of the powers of the fiduciary . . . as if no appeal were pending. All acts of the fiduciary pursuant to the directions of the court made under this subdivision are valid, irrespective of the result of the appeal. An appeal of the directions made by the court under this subdivision shall not stay these directions."

The verified petition further alleged that the conservatee was age 79 and in poor health. It reiterated that preventable injury to the estate would occur if he died before the actions approved by the substituted judgment were taken.

Hearing was held on the petition on July 19, 2001. Ms. Kravagna's counsel again relied on *Conservatorship of Hart, supra*, 228 Cal.App.3d 1244, to argue that a full evidentiary hearing was required. Counsel pointed out that a stipulation for examination of the conservatee by an independent medical examiner was pending. Counsel urged that the order be delayed until the receipt of report of the medical examination.

Conservator's counsel responded by saying: "The whole purpose of a substituted judgment is to protect the estate from several million dollars of estate taxes and to allow the trusts to be properly funded, one for the protection of Ms. Kravagna, the other for the protection of the other beneficiary, if he were to pass away. And that's entirely possible at any time."

Conservator's counsel relied on *Kane v. Superior Court* (1995) 37 Cal.App.4th 1577 [44 Cal.Rptr.2d 578]. In *Kane*, the court interpreted a predecessor statute as providing an exception to the stay provision "when the circumstances are such that it is necessary to take immediate action to prevent imminent injury or loss to a person or property . . . ." (*Id.* at p. 1584.) Although the order may be appealed, "the language the Legislature used in enacting this subdivision clearly empowers a trial court to direct such order to be immediately carried out unaffected by any subsequent appeal of the order, and without regard to the possible outcome on appeal." (*Ibid.*) The court emphasized "the Legislature's express recognition [that] some situations present such an extraordinary risk of injury or loss that they require immediate intervention by the probate court to make orders which can be implemented immediately despite the filing of an appeal, and regardless of the result on appeal." (*Id.* at p. 1586.)

The court granted the petition. It reiterated its earlier finding that Ms. Kravagna lacked standing, and it found that she had little chance of prevailing on her claims. Accordingly, the court found the risk of harm to her in allowing the conservator to take the requested actions was insignificant in

relation to the risk of harm to the estate if the action were not taken. The potential harm to the estate was the potential tax liability if the conservatee were to die before the actions were taken.

Although there was no current medical evidence concerning the conservatee's condition, the verified petition pointed out the undisputed fact that the conservatee was elderly and in poor health. Specifically, it stated: "He is now 79 years of age, and is in poor health. During June and early July 2001 he had to be hospitalized for over a week with pneumonia and was in a rehabilitation facility . . . for some three weeks. . . . As of yesterday the Conservator was advised that John McElroy is in a depressed state, refusing to eat, and refusing his medications."

The trial court did not abuse its discretion in determining that immediate action was necessary to avoid the tax liabilities the estate would unnecessarily incur if the conservatee died before the action was taken. In view of the age and failing health of the conservatee, the trial court could reasonably conclude that a full medical examination and hearing was unnecessary before the actions were taken. No abuse of its discretion has been shown. Accordingly, the order filed July 19, 2001, which directed the conservator to carry out the provisions of the substituted judgment, must be affirmed (case No. E029940).

In her reply brief, Ms. Kravagna shifts her focus by contending that the trial court abused its discretion in granting relief from the automatic stay (Prob. Code, § 1310, subd. (b)) because it failed to order the conservator to post a proper bond under Probate Code section 2320, subdivision (a). That section provides that, "[e]xcept as otherwise provided by statute, . . ." any person appointed as a conservator shall post a bond.

Although not mentioned in the reply brief, Probate Code section 1310, subdivision (e) provides: "An appeal shall not stay the operation and effect of a judgment for money or an order directing payment of money, unless one of the following applies: [¶] (1) A bond is posted as provided in Section 917.1 of the Code of Civil Procedure." Inferentially, it can be argued that a bond is not required for other types of appeals.

In any event, we ordinarily do not consider issues raised for the first time in the reply brief because the other party has not been able to respond to them. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446,

1453 [13 Cal.Rptr.2d 432].) However, Ms. Kravagna may raise the issue on remand by requesting the posting of an appropriate bond.[11]

DISPOSITION

In case No. E029587, the judgment of March 28, 2002, is reversed. In case No. E029770, the order granting the petition for substituted judgment, filed June 13, 2001, is affirmed. In case No. E029940, the order of July 19, 2001, is affirmed. Ms. Kravagna is to recover her costs on appeal.

Ramirez, P. J., and Richli, J., concurred.

---

[11]At oral argument, Ms. Kravagna's counsel raised another new issue by requesting that we modify the disposition to order the trial court to retain jurisdiction in order to preserve her standing to obtain an accounting of the second trust, and to generally require the trustees to account to the court for their activities under the second trust. We decline to do so, but we do not preclude Ms. Kravagna's counsel from renewing her request in the trial court. The trial court will undoubtedly consider all the circumstances of this case in making an appropriate order. (See fn. 10, *ante*.)